David S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
Jeremy Robinson, SBN 188325
*jrobinson@cglaw.com*
Ethan T. Litney, SBN 295603
*elitney@cglaw.com*
Alyssa Williams, SBN 310987
*awilliams@cglaw.com*
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

Attorneys for Plaintiffs and the Class

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMMA HEINICHEN and ANDREA ROSICA, on behalf of themselves and all others similarly situated, | CASE NO. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| LULAROE, LLC; LLR, INC.; and DOES 1-100, inclusive. | |
| Defendants. | |

Plaintiffs Emma Heinichen and Andrea Rosica, on behalf of themselves and all others similarly situated, bring this action for monetary damages, restitution, injunctive and declaratory relief from Defendants LuLaRoe, LLC; and LLR, Inc. (collectively, "LuLaRoe" or "Defendants").

## SUMMARY OF ACTION

1.     Defendants advertise, market, produce and sell leggings and other clothing. Consumers who purchase leggings and other clothing manufactured by Defendants regularly find Defendants' clothing is damaged, defective, or is of such poor quality that rips, tears, holes, and other damage appears upon first wearing, first washing, or shortly thereafter.

2.     Defendants have long been aware of the poor quality and defective nature of their clothing. Defendants have admitted as much, stating, "the leggings may get holes, because we weaken the fibers to make them buttery soft. We have done all we can to fix them."

3.      Thousands of consumers have raised similar issues about the poor quality of Defendants' products in complaints to the Federal Trade Commission, the Better Business Bureau, and over myriad social media platforms, including a Facebook Group titled "LuLaRoe Defective/Ripped/Torn Leggings and Clothes" that currently has over 32,000 members.

4.     The quality concerns of Defendants' leggings (the "Products") have become so pervasive that the television program "Inside Edition" recently ran a report discussing the defective nature of Defendants' products, including tips for consumers on how to purchase leggings "that won't tear or rip." Despite the well-known quality issues of their products, Defendants continued to advertise, market, manufacture and sell poor quality and defective leggings and other clothing.

5.     Defendants' business model focuses not only on the end-user of its products, but also on recruiting members of the general public, called "Consultants" (also known as "Independent Fashion Consultants," "Fashion Retailers," or "Independent

Retailers"), who buy Defendants' products at wholesale, and then sell the products to consumers through in-home and online "boutiques."

6. Despite exercising a substantial amount of control over how the Consultants resell Defendants' clothing, Defendants maintain that they are a multi-level marketing company, and that the "Independent Fashion Consultants are independent contractors, not employees."

7. Due to Defendants' business practices, more fully described herein, consumers have often found themselves unable to return their leggings for a refund or replacement, and in circumstances where Defendants' deign to respond at all to consumer complaints, they often provide no remedies for affected consumers, typically directing them to the Consultant from whom they originally purchased the leggings. However, Defendants' historically have failed to provide refunds to Consultants, and have made exchanges challenging, even going so far as recommending that Consultants learn how to sew in order to repair and resell defective clothing. This, among other policies, results in Consultants being unwilling to accept returns or exchanges.

8. As a result of the poor quality and defective nature of Defendants' clothing, Defendants' claims that their leggings and other clothing are fit for normal and athletic use, and Defendants' other business practices stated herein, thousands of consumers of Defendants' clothing in the United States have been stuck with damaged or defective LuLaRoe leggings or other clothing that could not be returned, exchanged, or worn without risking indecent exposure.

9. Plaintiffs bring claims on behalf of themselves and all others similarly situated for violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, the California Consumers Legal Remedies Act, Cal. Bus. & Prof. Code § 1750, *et seq.*, the New Jersey Consumer Fraud Act, New Jersey Code Ann. § 56:8-2 *et seq.*, for breach of the implied warranty of merchantability, and for quasi-contract/unjust enrichment.

**THE PARTIES**

10.     Plaintiff Emma Heinichen is a resident of San Francisco, California.

11.     After finding information about Defendants' Products online, Plaintiff Heinichen purchased four pairs of leggings made by Defendants on January 1, 2017. Plaintiff Heinichen wore one pair of leggings only twice before she noticed they had developed holes. When Plaintiff Heinichen attempted to wear another pair of Defendants' leggings to work, she noticed similar holes that same day while still at work wearing the leggings. The holes in both leggings were found in the crotch, buttock, or inner thigh areas.

12.     Plaintiff Heinichen's attempts to return the leggings have met substantial resistance or unwillingness from Defendants and their Consultants.

13.     At this time, Plaintiff Heinichen has been unable to receive a refund for all of the Products made by Defendants that she purchased.

14.     Plaintiff Andrea Rosica is a resident of Ocean Grove, New Jersey.

15.     After finding information about Defendants' Products online, Plaintiff Rosica purchased leggings and other clothing made by Defendants from 2016 to early 2017 from Consultants and through multi-Consultant sales on Facebook, including from Consultants residing and operating out of California. Plaintiff Rosica purchased four pairs of leggings that were of improper size, three leggings that developed holes and tears immediately after use, and an "Irma Tunic" with a large hole.

16.     Plaintiff Rosica has been unable to receive a refund for all of the defective leggings made by Defendants that she purchased.

17.     LuLaRoe, LLC is a California limited liability company with its headquarters in Corona, California.

18.     LLR, Inc. is a Wyoming corporation with its headquarters in Corona, California.

19.     LuLaRoe, LLC and LLR, Inc. are collectively referred to herein as "Defendants" or "LuLaRoe."

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the members of the proposed Class exceed $5 million, exclusive of costs, and at least one of the members of the proposed Class is a citizen of a different state than Defendants.

21.     The Northern District of California has personal jurisdiction over Defendants because they conduct substantial business in this District and it is in this District where Defendants have employed, and continue to employ, the advertising, marketing, manufacturing and sales activities detailed herein.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendants conduct operations, including sales and advertising in this District, and thus transact substantial business within this District. In addition, Defendants regularly sell and ship Products to hundreds if not thousands of Consultants within this District.

## FACTUAL ALLEGATIONS

23.     LuLaRoe was founded in 2012 by DeAnne Brady, and her husband, Mark Stidham.

24.     According to the LuLaRoe website, LuLaRoe was founded after DeAnne Brady heard the words "I believe in you" at a crucial time in her life, when "she was a single mother raising seven children and trying to balance time at work and at home[,] [s]he was desperate to find a way to be at home, be a mom *and* provide for her family."

25.     Defendants' juxtapose this "amazing story" with a purported motivation to empower women as a means of expanding their multi-level marketing enterprise through the exploitation of often vulnerable women, and others who become the Consultants. These Consultants are essential to Defendants' business model, which focuses on Consultants purchasing large amounts of inventory to directly resell to consumers. Defendants make little effort to obfuscate these intentions, as their

marketing videos specifically target vulnerable stay-at-home mothers after their husbands lose their jobs:

- "What really affects me is when women call me and say … [in emotional tone] 'My husband just lost his job… so I guess I'm it,' [in normal tone] and they say, [in emotional tone] 'Do you think I can do it DeAnne?' [in normal tone] and I get to get my pom-poms out and say, 'But don't you see this is an answer? This is easy! This is fun! This is something you can do together and he can watch the kids while you do parties,' and that's why I started LuLaRoe."[1]

26.    Based on the facts stated herein, at all times Consultants are acting as the ostensible and actual agents of Defendants.

27.    Little do these unwary potential Consultants know that Defendants' promised "easy" "answer" to their family's lack of income comes at a steep price. Consultants can pay anywhere from approximately $5,000 to $9,000 for their "initial order" or "onboard package" to begin selling Defendants products.[2] One complaint with the Federal Trade Commission ("FTC") alleged that Defendants charged a Consultant "over $7,000," for her initial package.

28.    Despite these financial hurdles, Defendants currently have approximately 80,000 Consultants. Unfortunately for these Consultants, LuLaRoe may not offer the dream of financial independence and empowerment it promises. The products Defendants sell to their Consultants, namely leggings and other clothing are often damaged, defective, and/or are of such poor quality that rips, tears, holes, and other damage appears upon first wearing, first washing, or shortly thereafter.

29.    As a result of the poor quality and defective nature of the Products, and the business practices of Defendants, a large number of consumers have taken their complaints directly to the FTC. These complaints demonstrate both the defective

---

[1] Video advertisement featuring DeAnne Brady, Archived at: https://www.truthinadvertising.org/wp-content/uploads/2017/04/Learn-the-story-of-LuLaRoe-from-owner-DeAnne-Stidham_1.mp4
[2] http://llrteamuplift.com/2016/11/lularoe-onboarding-package-november-2016/

nature of the Products as well as the difficulty in obtaining refunds or replacements from Defendants and Consultants. One consumer's complaint to the FTC in particular aptly describes the typical circumstances faced by consumers:

- A consumer who purchased a pair of leggings from a Consultant in March of 2016 noticed that the leggings "came to [the consumer] with multiple holes in them."  The consumer "tried to get a refund or replacement from the consultant numerous times with no resolution" and at that point the consumer "reached out to the [Defendants'] home office who promised 3 times they would send a replacement pair." The consumer complained that: "during my conversations with LuLaRoe's customer service team, they acknowledged that there had been a known quality issue with defective merchandise but it had since been resolved[,] I was told all new merchandise is up to quality standards." The consumer complained that "while they acknowledge there was a quality issue, they have done nothing to remedy my situation" and as a result the consumer "filed a Better Business Bureau complaint where again they noted the defective merchandise was no longer being sold and they would send me a replacement pair[,] 2 months after the BBB complaint I still have nothing." The consumer complained that they "followed back up with customer service who assured me once again they would resolve it[,] I waited 3 more weeks and now am contacting the AG of their home state." The consumer stated that "LuLaRoe knowingly defrauds customers by selling defective clothing[,] [a] quick peek at their BBB page shows that this is a problem many people seem to have[,] I would like LuLaRoe to acknowledge they've defrauded me and refund me my $30 I spent on leggings, tax, and shipping." The consumer complained that "[s]elling merchandise they know is faulty is wholly unethical[,] [m]aking several promises to resolve it with the customer and not once following through is unethical." The consumer stated that they "can provide pictures and copies of emails I've had with their consultant, customer service, and BBB rep upon

request" and that "[i]f there is no timely resolution, I do plan on proceeding with at the very least a small claims suit or, if I can gather enough people, a class action lawsuit. Thank You."

30. Many other consumer complaints to the FTC are equally as troubling, including, but not limited to, the following:

- A consumer complained they purchased a pair of LuLaRoe leggings from a Consultant on December 2, 2016, and that after they washed them three days after purchase (conforming to the washing directions "handwash, cold, hang to dry"), "the leggings are faded, have a hole in them, and cannot be worn." The consumer was forced to "contact LuLaRoe directly" because the Consultant denied a return and "stated that her return policy was new with tags, unwashed, unworn, scent and pet hair free and exchange if shipped in 3 days for the exchange." The consumer stated that LuLaRoe did not respond.

- A consumer alleged that they: "have had four pairs of leggings in total rip. The first pair had tiny pin holes throughout the thigh area. The second ripped while putting them on. The third tore two identical holes below the buttcheeks, this was the first time I wore them and I pretty much rode in the car all day. The fourth ripped along the seam."

- A consumer alleged that after purchasing an item of clothing from a Consultant, and failing to receive a receipt, they reached out to Defendants ("LuLuRoe corporate"). Defendants allegedly claimed that they "reached out" to the Consultant, but no further action was taken, and then Defendants stopped returning the consumer's messages.

- A consumer alleged that they purchased four pairs of leggings and that "2 of the 4 are defective and full of holes, one even has uneven legs." The consumer further complained that "the 'consultants' refuse to refund only exchange however, I can't get the same leggings I originally purchased. I should be able to return to get my money back for a cheaply made product if I

1  can't get the same ones in exchange. It's wrong to hold my money hostage

2  because I received pants full of holes." The consumer stated they reached out to

3  Defendants, and "received a generic reply about contacting a consultant for an

4  exchange. I expressed my concern about not getting the same product in an

5  exchange and I've been ignored."

6  31.   The allegations in the consumer complaints mirror the issues faced by

7  Plaintiffs, and demonstrate that Defendants' quality and return issues are pervasive, as

8  well as Defendants' knowledge and affirmative acknowledgment of quality issues.

9  32.   Plaintiff Heinichen purchased Defendants leggings that were made in Vietnam

10  that developed holes on the first and second wear, respectively. As seen below, holes

11  developed on the buttocks, crotch, or upper thigh areas of the leggings.



CLASS ACTION COMPLAINT

33.     Plaintiff Rosica enjoys partaking in yoga and adult dance classes. Upon hearing about leggings made by Defendants, including reviewing statements on Defendants' website as to the quality, durability, and acceptable uses for the leggings, Plaintiff Rosica purchased several pairs of leggings.

34.     In late 2016 and early 2017 Plaintiff Rosica purchased three pairs of leggings made by Defendants that developed holes, rips, or tears immediately upon wearing. Plaintiff Rosica had one pair of "cupcake" leggings that ripped as she was putting them on for first wear, one pair of "flower" leggings that starting exhibiting small holes upon first wear as she was driving to her way to work, one pair of "pink polka dot" leggings that exhibits holes in the thigh area upon first wear while she was at work. The damage to the leggings described above can been seen in the below images.



35.     Plaintiff Rosica also purchased four pairs of "OS" (one size) leggings made by Defendants that were improperly manufactured too small. Unlike previous OS leggings Plaintiff Rosica had purchased, these four pairs were so small she could not even put them on. At the time, Plaintiff Rosica was typically a size 8 or 10, and the OS leggings are stated to fit sizes up to 12. Plaintiff Rosica had previous purchased a pair of OS leggings that fit her comfortably. All of the defectively small leggings

purchased by Plaintiff Rosica were manufactured after May 2016.

36.     In addition, in December of 2016 Plaintiff Rosica purchased an "Irma Tunic" top made by Defendants that came with a large hole in the back.

37.     Plaintiff Rosica has identified that the leggings she purchased after fall of 2016 are of a significantly different quality than leggings previously purchased, and that the leggings generally feel completely different, including feeling thinner and less stretchy.

38.     Plaintiffs expected leggings made by Defendants to conform to the representations made by Defendants, and relied on Defendants' affirmative representations as to quality and durability of the leggings, and that the leggings would generally be fit for use in activities where leggings are typically worn, such as yoga and adult dance classes.

39.     When the multitude of customers who, like Plaintiffs, receive defective clothing from Defendants attempt to return or exchange the Products, they often face significant hurdles. If Defendants deign to respond to consumers, they are told to contact the Consultant from whom they purchased the property, given the run-around, put on hold to no avail, or are simply ignored. The condition of the Products and Defendants' business practices (specifically those practices deterring or disincentivizing returns, refunds, and exchanges) has lead a significant number of Defendants' own Consultants to complain to the FTC as well:

- A Consultant complained that "Requests for refunds have been ignored. Spend hours on hold only to be disconnected after two hours of waiting. No one calls back."

- A Consultant complained that they had waited over two months for LuLaRoe to resolve a merchandise issue, and stated "calling the LuLaRoe customer service line is ridiculous and will take hours on hold to even make it to a live person."

- A Consultant complained about the difficulty in achieving resolution

through Defendants, stating that "I have contacted LuLaRoe through their ticket system for consultant issues twice (the ticket system has now been taken down), their email system once, and by phone twice."

40.   Consumer and Consultant complaints are not limited to the Federal Trade Commission. Consumers and Consultants have made hundreds of complaints to the Better Business Bureau ("BBB") such that Defendants are rated "F" by the BBB. On March 2, 2017, the BBB stated it was "Issu[ing] [a] Consumer Alert Regarding Consumers Complaints about LuLaRoe." This "Consumer Alert" stated that "the Better Business Bureau is alerting customers about LuLaRoe merchandise that has been reported to fall apart shortly after purchase and difficulty obtaining refunds[,] The company has an 'F' rating with BBB." The BBB has currently withdrawn its accreditation of LuLaRoe due to factors such as the extent of consumer complaints and/or Defendants' failure to make a good faith effort to resolve any consumer complaints.

41.   The complaints to the BBB by consumers contain facts that generally mirror the complaints to the FTC:

- On February 8, 2016, a consumer complained: "I received defective products from Lularoe. I contacted them and they replaced my defective product with more defective product and now won't respond. I placed an order on 1/08/16 and 1/09/16 for 12 pairs of leggings … [w]hen the leggings arrived, 8 of the 12 were severely defective (crooked seams, sizes not following LLR charts, etc.) I wrote Lularoe on January 14, [2016] to let them know of the defective product and provided pictures of all 8 … when I received [replacements], they sent me duplicate product patterns and one with a hole in it. So they sent me defective product to replace defective product … I then contacted Lularoe on the 19th of January [2016] with this issue in detail (again provided photos) and again on the 22nd with zero response … I emailed Lularoe again first thing on 1/25/16 and have also called three times, waiting on hold for

40 minutes until it automatically disconnects you, and left a voicemail on 1/26/16. The automated message says they would return my call that day and they did not. Nor did they answer my final attempt email."

• On March 6, 2017, a consumer complained that they were "absolutely addicted to LuLaRoe for several months last year and brought a good amount of leggings in a short period of time." But the consumer noted that, "recently, the 4 or so pairs I've bought have had MAJOR defects. Major. I've had to return every last one of them. I finally got the coveted solid black leggings in TC, and within 1 hour they had 2 holes in the rear which manifested into major tears by the end of my evening (thank goodness I had a long jacket)." The consumer stated that "it hurts my heart to have to write such a negative review because I was truly addicted to LuLa[Roe]. However, because of the massive amount of onboarding, demand has skyrocketed, which in turn has completely shattered the quality of the products. Myself and MANY others I know are giving up on LuLaRoe … It's so disappointing. Not to mention, LuLaRoe flat out LIED when they mentioned defects were half of what is standard for other clothing companies. That is complete and total BS."

• On March 14, 2017, a consumer complained that "in the last three months, every pair of leggings I've purchased have holes in them within hours of wearing them. I handwash my leggings and line dry. I'm fully aware of how to properly take care of my leggings."

• On March 16, 2017, a consumer complained that they had received "three pairs of leggings with holes. Literally every single pair I have bought developed holes after a few hours of wear. Today I had a pair literally shred apart in the rear. I wear a size 6 in jeans and the [one-size leggings] are supposed to fit up to a 12. The leggings are ripping through normal activity."

42. The complaints to the BBB by Consultants contain facts that also generally mirror the complaints to the FTC:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

•        On March 7, 2017, a Consultant complained that "When I first discovered this company it was like a dream come true. The clothes are super comfy and some of the patterns are super cute. They were styles I had already been buying from stores like Avenue, Target, Ross, Etc. I got addicted quickly, which is their goal. But there was an opportunity to start your own business doing it so you could 'work from home.' That was about a year ago and only lasted a few months as I saw behind the scenes. I did get several pairs of leggings that arrived with holes. Some of the clothing did the pilling thing, despite washing on delicate and hanging dry." The Consultant further complained that "My initial order came with about 10 defective pieces of clothing, holes, cuts, tears, but they made it so hard to return, you had to pay for the shipping yourself, and ship them back exactly how they sent them to you … it took them months to refund that money." The Consultant also recognized that "The biggest issues are quality going down hill, onboarding too many consultants to keep up with demand (causing quality to go down), their computer and payment systems not working properly, taxes not charged correctly, and getting a hold of customer support (on the phone hours waiting for someone to try to resolve your issue, then still have to wait months to get your money back)." The Consultant stated that she "hate[d] writing negative reviews, but people need to be careful buying or getting involved with this company … the company pushes a cheerful attitude, and expects the consultants to gloss over their quality issues … this company has gone to the quantity over quality side. Buyer beware with this company."

•        On April 3, 2017, a Consultant complained that "[LuLaRoe] sells you minimum $5000 worth of clothing and tell you 'think like a retailer'. When the clothing fails (leggings aren't sewn up, legs are 3 inches different in length, fabric has hole in the butt and rips open on first wear) they put the responsibility of replacement / refund on the selling consultant AND take no responsibility for

resolving this problem. When you submit these "as damages" they are declined. When you file a complaint, ask corporate for help, or go to your "upline" who is making 5% off everything you purchase, they boot you out of the team FB page, shun you, tell you you are just lazy and to feed your kids cereal so you can work the business. WOW. Blessing lives and families??? I doubt it. I was a consultant and a customer."

- On April 12, 2017, a Consultant complained that "No one will even answer my inquiry for a status on my refund which is well past due. I've spoken to others with these issues, as well as issues with their inventory being cheaply made, and their leggings getting large holes in them after one wear (some even come with holes in them!). AVOID AT ALL COSTS."

43.     In sum, Defendants have received repeated notice that their Products are sold defective, damaged, or of such poor quality that rips, tears, holes, and other damage appears upon first wearing, first washing, or shortly thereafter. When the BBB receives a consumer complaint, the BBB sends the complaint to the company and provides it an opportunity to respond. Further, consumers have filed complaints about Defendants with the BBB since at least very early 2016, with some BBB complaints (including those referenced above) stating that Defendants were provided detailed accounts and corroborating images of the damaged and defective nature of the Products as early as January 2016, if not far earlier.

44.     Defendants are fully aware of the defective nature of the Products, as a January 17 company-wide e-mail from Patrick Winget, the head of production from LuLaRoe, stated, "The leggings may get holes, because we weaken the fibers to make them buttery soft. We have done all we can to fix them." Defendants allegedly use "a special brushing technique" to achieve the advertised softness, and know that by eliminating that technique they could mitigate the defective nature of the Products.

45.     With Defendants' myriad production, management, and customer service issues, it is no surprise that Consultants may not be able to realize the "opportunity to

have the means, the time, and the flexibility to pursue [their] passions and to more fully enjoy the company of those [they] love." Especially when those they love are most often the people to whom they are selling Defendants' Products. According to Defendants' own 2015 financial disclosures, over 87% of LuLaRoe consultants received no money from Defendants.[3]  As of May 18, 2017, when searching for going out of business sales on Google.com ("GOOB sale"), the top result includes the text, "PSA: Hit Up A GOOB Sale If You're Looking For A Good LuLaRoe Deal."

46.     Despite the financial hurdles of becoming a Consultant and the difficulties faced by Consultants in maintaining profitability, Defendants continue to enlist Consultants. According to Business Insider, as of September 2016 Defendants had 38,277 Consultants, whereas in February 2017 Defendants had 77,941 Consultants, more than doubling the number of Consultants in merely five months[4].

47.     These numbers lend credence to the to the repeated claims by Consultants and consumers alike that faced with the influx of new Consultants, Defendants have knowingly focused on ensuring sufficient quantity over quality of the Products. Why Defendants failed to ensure their products were of sufficient quality and defect-free is unclear, given that the cost for these new Consultants' initial "onboarding" purchases between September 2016 and February 2017 alone would seemingly result in hundreds of millions of dollars in revenue for Defendants, not to mention the over $3,000 per month of inventory required by Consultants if they wish to be eligible for bonus commission[5] from Defendants.

48.     In any case, it is clear that Defendants are manufacturing defective and damaged Products that are of substantially worse quality than what a reasonable consumer would expect, what many previous consumers of LuLaRoe products believe

---

[3] http://www.lularoe.com/income-disclosure-statement/
[4] http://www.businessinsider.com/how-much-money-lularoe-consultants-make-2017-3
[5] Consultants are required to purchase 175 pieces of clothing per calendar month to maintain eligibility. Average wholesale price of clothing based on price of onboarding packages from November 2016 (http://llrteamuplift.com/2016/11/lularoe-onboarding-package-november-2016/).

they have come to expect, and the Products fail to serve the basic purpose of clothing, to actually cover the areas of the body that are meant to be covered.

49.     Despite this precipitous drop in quality, Defendants have continued to affirmatively misrepresent the quality and durability of the Products, and state that the Products are fit for normal and athletic use.

50.     With respect to their Products, until April 2017, Defendants website stated that: "Our leggings are ultra stretchy and super soft. They're as close to your own skin as you can get with all the perks of, ahem, not being naked. You can sport them at your favorite Pilates class or throw on some cute booties and wear them out for a girls night!"

51.     Previously, the same LuLaRoe webpage stated: "We've seen prints and patterns fade with wash after wash, but we've made sure to make our bright leggings from materials that will last even the longest week of wear. We guarantee that these buttery soft Leggings will become the favorite thing in our shop and in your drawers. Hands down. No questions asked. Girl, we mean it! We made sure that there is just enough stretch in the stretchy material used in each pair that when worn, they fit you just perfectly. Not too tight, not too loose and they won't stretch out." (emphasis added).[6]

52.     Defendants' statements affirmatively misrepresent the quality and durability of Defendants' Products. Defendants products do not meet these stated quality or durability expectations, or the expectations a reasonable consumer would have for similar clothing, and are unfit for normal or athletic use, or even merely covering. Rather, Defendants' Products are often damaged, defective, or are of such poor quality that rips, tears, holes, and other damage appears upon first wearing, first washing, or shortly thereafter. Defendants' Products do not last a week, much less the longest week of wear.

---

[6] These exact representations are still present on numerous advertisements of Consultants selling LuLaRoe branding leggings. See, e.g., https://beauty-and-brawn.myshopify.com/products/lularoe-leggings (last accessed May 18, 2017).

53.     As of May 2017, Defendants' representations that the Products are fit for athletic use, such as being fit for wear at a Pilates class, have been removed from Defendants' website. At an earlier date, Defendants' statements that they have manufactured the leggings from materials that will last even the longest week of wear, and the use the of the word "guarantee" were also removed. Presumably these changes were made in response to widespread consumer frustration that the Products are too frail to withstand normal, much less athletic use, such as at a Pilates class, or that rather than withstanding "the longest week of wear," the Products cannot even withstand a single use, or single wash. The more recent change seems to coincide with Defendants' acknowledgement that customers have complained of receiving Products since at least January 2016.

54.     Defendants' business practices further exacerbate customers' poor experiences with Defendants' Products.

55.     Defendants categorically refused to engage in providing refunds or exchanges to customers who purchased and received their Products. The LuLaRoe website states plainly that "[A]ny request pertaining to returns, damages, or shipping should go to the original Retailer you purchased from. THANK YOU."

56.     Based on Defendants' policies, Consultants often do not provide refunds and in the few cases where they will offer an exchange, it will often not be for the same item that a consumer purchased. As one of the selling points of the Products is the rarity of particular patterns (also known as "unicorns"), consumers often are unsatisfied with obtaining any replacement but the same pattern, which is difficult to obtain as Consultants can charge significantly more for such unicorns.

57.     Moreover, Defendants ostensibly allow their Consultants to dictate their own return policies, with the understanding that Defendants will not be responsible for the attendant costs of dealing with a return, exchange, or refund of their Products. Many Consultants state that they will only exchange unworn, unwashed clothing with tags attached that were originally purchased from them within a limited number of days.

This excludes thousands of consumers with complaints such as those referenced herein, who wore the Defective Product once, or washed the Defective Product once before the Defective Product developed a hole, rip, tear or other damage.

58.     Many Consultants have participated in the weekly conference calls that Defendants hold with Fashion Consultants, including those where Mark Stidham has told Consultants not to spend time and energy sending Products back to the Company, but that they should try to re-sell them to Consumers, including by learning to sew and repairing any Products.

59.     In April 2017, in response to overwhelming backlash against the quality and return issues related to the Products, Defendants instituted three new policies as an attempt to gain some goodwill from customers: (1) the "Happiness Policy"; (2) the "Limited Warranty"; and (3) the "MAKE GOOD Program"[7].

60.     Defendants' new policies pay lip service to mounting consumer complaints, while allowing Defendants to continue to place the burden of dealing with the Products primarily on Consultants.

61.     While the new policies may appear to extend goodwill to consumers who purchase the products, they ultimately fail to provide adequate relief to such consumers.

62.     The Happiness Policy ostensibly allows consumers to return Defendants' Products within 30 days for a full refund, credit, or exchange, and or within 90 days for a credit or exchange. Ultimately, refunds, credits, and exchanges are effectuated through Consultants. If the Consultant who sold the original product to the consumer refuses to accept the return, Defendants place the burden on a Consultant that had no involvement in the original transaction. The Limited Warranty similarly places the burden squarely on Consultants.

63.     More importantly for the consumer, a customer is only eligible for the

---

[7] See http://www.lularoe.com/happinesspolicy; http://www.lularoe.com/limitedwarranty; and http://www.lularoe.com/makegood

Happiness Policy or the Limited Warranty if the purchase was made on or after April 25, 2017. This excludes customers who purchased defective Products before that date. Further, the Limited Warranty may only result in "replace[ment] with a similar product," not the product the consumer paid for.

64.     The MAKE GOOD Program is an acknowledgment that Defendants manufactured and distributed products that that contained a defect in materials or workmanship at least as early as January 1, 2016. The MAKE GOOD program is only available to consumers who purchased Defendants' clothing between January 1, 2016 and April 24, 2017, who submit a claim no later than July 31, 2017.

65.     However, Defendants required proof of purchase and proof of the defective nature of the clothing, which will exclude a significant number of consumers who purchased defective clothing prior to January 1, 2016. The MAKE GOOD program will also exclude those who have previously attempted to return defective Products to no avail, and have reasonably believed that they had no effective recourse and thus did not retain proof of purchase and proof of defect for up for to 16 months.

66.     Further, Defendants have failed to provide notice of the MAKE GOOD program to all customers who purchased Products between January 1, 2016 and April 24, 2016.

67.     While Defendants state that the MAKE GOOD Program demonstrates that Defendants stand behind their products, it further demonstrates how poorly they treat their Consultants and customers.

68.     Despite stating that Consultants are "*Independent* Fashion Consultants," both the Limited Warranty and MAKE GOOD Program state that the new policy states that even if the consumer does receive assistance from the Consultant from whom they purchased the Defective Product, Defendants will put them in touch with a Consultant uninvolved with the original transaction, and that "The *Independent* Fashion Retailer will process your claim and shipping at no charge."

69.     Similarly, the Happiness Policy states that Defendants will connect consumers

with a Consultant uninvolved with the original transaction, if necessary, to process the

return, refund, credit, or exchange.

70.     The reality of the new policies is that Defendants have more aggressively

shifted the responsibility for their manufacturing

defects and quality control issues to the allegedly

independent Consultants. These Consultants, even

when uninvolved with the original transaction,

often must refund the full retail price of the

transaction out of pocket (or purchase a LuLaRoe

gift card in the amount of the full retail price), and

pay the full shipping cost out of pocket to return

the Products. When the product is ultimately

returned to Defendants, the unfortunate

Consultant only receives *the wholesale price* for

the merchandise, providing a significant

disincentive for a Consultant to effectuate a return

or refund. An image allegedly describing one such

interaction with an uninvolved Consultant is seen

at right.



71.     Therefore, Defendants' post-April 2017 policies and business practices have

changed little, and consumers still face difficulties obtaining refunds, returns, or

exchanges for Defendants' Products, if not more difficulty than prior to Defendants'

adoption of the new policies. This is because the primary consequences of

Defendants' Products are unfairly borne by Consultants, who justifiably have no

interest in providing returns, refunds, or exchanges to transactions where they were

not in any way involved. Therefore, consumers are forced to expend undue time and

energy for a resolution that will typically be unsatisfying, such as receiving a different

replacement product or a LuLaRoe gift card. The new policies are inadequate.

72.     Plaintiff Heinichen has experienced the effects of the new policies first-hand. After the new policies were announced, Plaintiff Heinichen attempted to utilize the new policies to receive a refund from Defendants.

73.     After filing a claim with Defendants, Plaintiff Heinichen received the e-mail addresses of two Consultants not involved with her original transaction, seen below.



On Mon, May 1, 2017 at 4:25 PM PDT, Make Good <makegood@lularoe.com> wrote:
Hello Hello, Emma!

Thank you for your request. Below you will find the information for a couple independent retailers near your area. If one of the retailers is unable/unwilling to help please reach out to the other retailers provided for assistance.

Mary
lularoemary███████@gmail.com

Ursula
lularoeursula███████@gmail.com

If these retailers are unable to assist you please respond to this email so we can resolve this issue for you. If a retailer has assisted you and was able to resolve this matter for you please reply to this email to inform us. Thank you and I hope to hear from you soon!

74.     As evidenced by the complaints directly to the FTC, BBB, and Defendants in early 2016 referenced herein, Defendants know and have known that the Products are defective, regardless of whether it has to do with intentional weakening of the Products as stated by Defendants, or whether it is due to cutting corners in the manufacturing or quality control process.

75.     Despite this knowledge, Defendants have failed to remedy the defects in the Products, and have maintained policies that shift the burden of providing returns, exchanges, and refunds of Products to the Consultants. This has allowed Defendants to ignore customer complaints about the Products, avoid paying costs related their own shoddy manufacturing or poor quality control, and engage in policies and practices that disincentivize Consultants from providing returns, exchanges, or refunds to consumers.

76.     Defendants' actions have substantially injured thousands of consumers who have purchased their products, and have allowed them to significantly avoid responsibility for the manufacture and advertising of defective products by placing an ever-increasing burden of their shoddy clothing and poor business practices on their own agents, the Consultants, resulting in substantial injury to consumers nationwide.

## CLASS ALLEGATIONS

77.     Plaintiffs bring this action on behalf of themselves and the members of the proposed Class under Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following Classes (collectively referred to as "the Class" unless differentiation is required):

**California Class**

All persons, who are California residents, or who purchased the Products within the State of California for personal, family or household use, within the applicable statute of limitations period.

**New Jersey Class**

All persons, who are New Jersey residents, or who purchased the Products within the State of New Jersey for personal, family or household use, within the applicable statute of limitations period.

78.     Plaintiffs reserve the right to redefine the Class, including by proposing multi-state Classes, prior to class certification after having the opportunity to conduct discovery.

79.     Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers and directors, any entity in which Defendants have a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

80.     Numerosity. Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the precise number which is within the knowledge of and can be ascertained only by resort to Defendants' records.

81.     Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are numerous questions of law and fact common to the Class, which predominate over any questions affecting only individual members of the Class. Common questions of law and fact include, but are not limited to:

(a) Whether, during the Class Period, Defendants misrepresented that the Products were suitable for wear and ordinary use when they were not;

(b) Whether, during the Class Period, Defendants misrepresented that the Products were suitable for athletic use when they were not;

(c) Whether, during the Class Period, Defendants misrepresented that the Products were of a certain quality or durability when they were not;

(d) Whether, during the Class Period, Defendants concealed material facts concerning the quality or durability of their Products;

(e) Whether Defendants failed to employ adequate quality control measures to avoid shipping defective Products;

(f) Whether Defendants engaged in deceptive, unfair, unlawful and/or fraudulent business practices under California law;

(g) Whether Class members are entitled to restitution, and in what amount; and

(h) Whether Defendants should be enjoined from continuing the practices alleged herein.

82.     Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of the members of the Class and, like all members of the Class, Plaintiffs purchased Products advertised, marketed and manufactured by Defendants. Accordingly, Plaintiffs have no interests antagonistic to the interests of any other member of the Class.

83.     Adequacy. Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately assert and protect the interests of the Class, and retained counsel experienced in prosecuting class actions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

84.     Superiority of Class Action. Fed. R. Civ. P. 23(b)(3).  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by

the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

85.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

86.    Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).  The conduct of Defendants is generally applicable to the Class as a whole and Plaintiffs seek equitable remedies with respect to the Class as a whole. As such, the systematic policies and practices of Defendants make declaratory or equitable relief with respect to the Class as a whole appropriate.

87.    Issue Certification. Fed. R. Civ. P. 23(c)(4). In the alternative, the common questions of law and fact, set forth above, are appropriate for issue certification on behalf of the proposed Class.

## CLAIMS ON BEHALF OF THE CALIFORNIA CLASS

### FIRST CAUSE OF ACTION

**Unfair Business Practices in Violation of Unfair Competition Law ("UCL")**

**(California Business & Professions Code § 17200 *et seq.*)**

88.    Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

89.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.

90.    During the relevant time period, Defendants engaged in unfair business

practices, as described herein, including by selling Products to Consultants knowing that such Products would be sold to members of the general public, while engaging in policies and business practices that did and continue to stymie and otherwise prevent consumers from returning, adequately exchanging, or receiving a refund for the Products, as alleged herein.

91.     During the relevant time period, Defendants engaged in unfair business practices, as described herein, including by selling Products to Consultants knowing that such Products would be sold to members of the general public, while failing to employ adequate quality control measures to prevent distributing Products that are damaged, defective, or are of such poor quality that rips, tears, holes, and other damage appears upon first wearing, first washing, or shortly thereafter

92.     During the relevant time period, Defendants also engaged in unfair business practices by misrepresenting and omitting material facts they were obligated to or should have disclosed regarding the quality and durability of the Products, as alleged herein, including the fact the Products were known to be defective. Defendants were in exclusive possession of such information but did not disclose it, even though such information went to the quality and ordinary use of the Products. In affirmatively misleading consumers about the quality and durability of the Products, and failing to disclose the defective nature of the Products, Defendants concealed material facts from consumers and caused substantial injury, with no benefit other than to Defendants.

93.     Such information with respect to the quality, durability, and suitable use of the Products was material to Plaintiff Heinichen and the California Class in that as reasonable consumers they would have considered such information to be a substantial factor in deciding whether to purchase Products from Defendants. Plaintiff Heinichen and the California Class members had a reasonable expectation that Defendants' Products would meet the advertised standards of quality and durability, and would not be defective but would be fit for their ordinary use, including covering.

Further, Plaintiff Heinichen and the California Class had a reasonable expectation that the products would not be damaged, defective, or are of such poor quality that rips, tears, holes, and other damage appears upon first wearing, first washing, or shortly thereafter.

94.    Defendants' practices, as described here, constitute unfair business practices in violation of the UCL because, among other things, they are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and/or any utility of such practices is outweighed by the harm caused to consumers. Defendants' practices caused substantial injury to Plaintiff Heinichen and members of the California Class and are not outweighed by any benefits, and Plaintiff Heinichen and members of the California Class could not have reasonably avoided their injuries.

95.    As a result of Defendants' unfair business practices, Plaintiff Heinichen has suffered injury in fact and a loss of money or property in terms of purchasing the Products that are unsuitable for their ordinary use as clothing, which she would not have purchased at the prices she paid had the true nature of the Products not been misrepresented or had the material facts been fully disclosed, and which otherwise may be been returned for a refund.

96.    Pursuant to Business and Professions Code §17204, Plaintiff Heinichen and the California Class are entitled to an order of this Court enjoining Defendants' alleged misconduct, and any other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants received or saved as a result of its wrongful acts and practices detailed herein, and restoring to any person in interest such monies paid for Defendants' Products by ordering the payment of full restitution plus interest. Otherwise, Plaintiff Heinichen, Class Members, and members of the general public may be irreparably harmed or denied an effective and complete remedy if such an order is not granted.

**SECOND CAUSE OF ACTION**

**Unlawful Business Practices in Violation of Unfair Competition Law ("UCL")**

**(California Business & Professions Code § 17200 *et seq.*)**

97.     Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

98.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

99.     Defendants' deceptive and misleading business practices and acts, as described herein, breached and continue to breach the implied warranty of merchantability. Defendants' conduct also violated and continues to violate California's Consumers Legal Remedies Act, § 1750 *et seq.*, by representing that the Products are, among other representations set forth herein, suitable for normal and athletic use, and are of a particular quality and durability when they are not.

100.    Plaintiffs reserve the right to identify other violations of law as the facts develop.

101.    As a result of Defendants unlawful business practices, Plaintiff Heinichen has suffered injury in fact and a loss of money or property in terms of purchasing the Products that are unsuitable for their ordinary use as clothing, which they would not have purchased at prices they paid had the true nature of the Products not been misrepresented or had the material facts been fully disclosed.

102.    Pursuant to Business and Professions Code §17204, Plaintiff Heinichen and the California Class are entitled to an order of this Court enjoining such conduct on the part of Defendants, and any other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants received or saved as a result of its wrongful acts and practices detailed herein, and restoring to any person in interest such monies paid for Defendants' Products by ordering the payment of full restitution. Otherwise, Plaintiff Heinichen, Class Members, and members of the general public may be

irreparably harmed or denied an effective and complete remedy if such an order is not granted.

## THIRD CAUSE OF ACTION

### Fraudulent Business Practices in Violation of Unfair Competition Law ("UCL")

### (California Business & Professions Code § 17200 *et seq.*)

103.   Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

104.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive reasonable consumers.

105.   Defendants have misrepresented the quality, durability, and suitable uses of the Products, as set forth herein.

106.   Further, Defendants failed to disclose material facts regarding the defective nature of the Products and their failure to conform with Defendants' statements, advertisements, and warranties, including that they are not fit for ordinary or athletic use. These undisclosed facts with respect to the Products are material in that Plaintiffs would have considered the facts to be a substantial factor in deciding whether or not to purchase and use Defendants' Products.

107.   Plaintiff Heinichen and the California Class had a reasonable expectation the Products would conform to Defendants' statements, advertisements, and warranties, and would be fit for normal and athletic use, as demonstrated by the Plaintiffs' expectations and stated herein and the numerous consumer complaints referenced herein.

108.   Based on the facts set forth herein, Defendants were under a duty to Plaintiff Heinichen and the California Class to disclose the defective nature of the Products. Such a duty existed because Defendants had exclusive possession and knowledge of facts that were not available to consumers and that were material.

109.   Defendants' conduct was and is likely to deceive reasonable customers into believing Defendants' Products were suitable for normal use, and Plaintiff Heinichen

1    was deceived.

2    110.   As a result of Defendants' fraudulent business practices, Plaintiff Heinichen has

3    suffered injury in fact and loss of money or property by buying Products that are

4    unsuitable for their normal and advertised use, which they would not otherwise have

5    purchased at prices they paid had the true nature of the Products not been

6    misrepresented or had the material facts been fully disclosed.

7    111.   Pursuant to Business and Professions Code §17204, Plaintiff Heinichen and the

8    California Class are entitled to an order of this Court enjoining such conduct on the

9    part of Defendants, and any other orders and judgments that may be necessary to

10   provide for complete equitable monetary relief by disgorging Defendants' ill-gotten

11   gains, including the monies Defendants received or saved as a result of its wrongful

12   acts and practices detailed herein, and restoring to any person in interest such monies

13   paid for Defendants' Products by ordering the payment of full restitution. Otherwise,

14   Plaintiff Heinichen, Class Members, and members of the general public may be

15   irreparably harmed or denied an effective and complete remedy if such an order is not

16   granted.

## FOURTH CAUSE OF ACTION

### Violation of California Consumers Legal Remedies Act ("CLRA")

### (California Civil Code § 1750 *et seq.*)

20   112.   Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate

21   them as though fully set forth herein.

22   113.   The CLRA was enacted to protect consumers against unfair and deceptive

23   business practices. It extends to transactions that are intended to result, or which have

24   resulted, in the sale of goods or services to consumers. Defendants acts, omissions,

25   misrepresentations, and practices as described herein fall within the CLRA.

26   114.   Plaintiff Heinichen and the California Class are "consumers" within the

27   meaning of California Civil Code §1761(d).

28   115.   The Products are "goods" within the meaning of California Civil Code

§1761(a).

116.   Defendants' acts, omissions, misrepresentations, and practices were and are likely to deceive reasonable consumers. By misrepresenting the quality, durability, and performance of the Products, Defendants violated the CLRA.

117.   Defendants had exclusive knowledge of undisclosed material facts, including that the Defendants "damaged the fibers" thereby making the Products defective and/or more defective, and not reasonably fit for their intended use or ordinary purpose, and withheld that knowledge from Plaintiff Heinichen and the California Class.

118.   Defendants had additional knowledge of the fragility of the Products and the failure of the Products to conform to the advertisements and statements about the quality and durability of the Products through numerous consumer complaints.

119.   Defendants' acts, omissions, misrepresentations, and practices alleged herein violated the following provisions of the CLRA, Civil Code § 1700, which provides, in relevant part, that:

(a) The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

(5)   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . .

(7)   Representing that goods or services are of a particular standard, quality, or grade . . . if they are of another.

(9)   Advertising goods with the intent not to sell them as advertised.

120.   The acts and practices of Defendants, as alleged herein, constituted and constitute unlawful methods of competition, unfair, or deceptive acts undertaken in a transaction which resulted in the sale of goods to consumers including, but in no way limited to, Defendants' failure to disclose "damaging the fibers" of the Products, and

Defendants' advertisements and statements about the quality and durability of the Products, which they knew or should have known to be untrue.

121.   Defendants engaged in deceptive acts and business practices by, among other things: (a) promoting the Products as durable, including stating that they were made from materials that will last even the longest week of wear, rather than mentioning the damaged nature of the Products; (b) failing to provide refunds when requested; (c) urging Consultants to attempt to repair and resell the Products; (d) failing to properly investigate, mitigate, and disclose the problems associated with the Products, and (e) continuing to release new Products, while the number of consumer complaints grows ever larger.

122.   Defendants knew, or at the very least should have known, that the Products were defective and inappropriate for consumers' typical use.

123.   Defendants' deceptive acts and business practices induced Plaintiff Heinichen and the California Class members to purchase the Products. But for these deceptive acts and business practices, Plaintiff Heinichen and the California Class would not have purchased the Products, or would have purchased the Products at a lower price.

124.   As a direct and proximate result of Defendants' violations of the CLRA, Plaintiff Heinichen and the California Class have been injured, including but not limited to, the following:

(a) The infringement of their legal rights as a result of being subjected to the common course of deceptive conduct alleged herein;

(b) Being induced to purchase the Products, which they would not have done but for Defendants' actions, omissions, practices, and nondisclosures as alleged herein (in violation of the CLRA and the UCL);

(c) Being induced to rely on Defendants' deceptive representations and intentional omissions to their detriment; and

(d) Unknowingly being subjected to deceit as a result of Defendants' conduct.

As the result of Defendants' violation of the CLRA, Plaintiff Heinichen and the

California Class will be entitled to compensatory and exemplary damages, an order enjoining Defendants from continuing the unlawful practices described herein, a declaration that Defendants' conduct violated the CLRA, attorneys' fees, and the costs of litigation.

125.   Pursuant to Civil Code § 1782, concurrently with the filing of this Complaint, Plaintiffs will provide notification to Defendants in writing by certified mail pursuant to Civil Code § 1782 and demand that Defendants' Civil Code § 1770 violations be corrected. If Defendants fail to rectify or fail to agree to rectify the problems described herein within 30 days of the date of written notice pursuant to Civil Code § 1782, Plaintiffs are and will be entitled seek actual, punitive, and statutory damages pursuant to this claim, as appropriate in accordance with Civil Code § 1782(a) & (d).

## CLAIMS ON BEHALF OF THE NEW JERSEY CLASS

### FIFTH CAUSE OF ACTION

**Violation of New Jersey Consumer Fraud Act**

**(New Jersey Statutes Annotated 56:8-2 *et seq.*)**

126.   Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

127.   The New Jersey Consumer Fraud Act declares that "the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise […] whether or not any person has in fact been misled, deceived or damaged thereby," to be unlawful practices.

128.   As further alleged herein, Defendants engaged in numerous unlawful practices that violate the Consumer Fraud Act, by, among other things: Defendants engaged in deceptive acts and business practices by, among other things: (a) promoting the Products as durable, including stating that they were made from materials that will last

even the longest week of wear, rather than mentioning the damaged nature of the Products, and continuing to misrepresent the quality of the Products after knowing that the Products were defective; (b) failing to provide refunds when requested; (c) urging Consultants to attempt to repair and resell the Products as new products; (d) failing to properly investigate, mitigate, and disclose the problems associated with the Products, and (e) continuing to release, market, and advertise new Products, while the number of consumer complaints grows ever larger.

129.    Defendants knew, or at the very least should have known, that the Products were defective and inappropriate for consumer's typical use. Despite this knowledge of material facts that, if disclosed, would have affected consumers' decision to buy the Products, or alternatively, would have resulted in the consumers paying less for the defective product, Defendants omitted materials facts from consumers with the intention that consumers would rely upon the concealment.

130.    Defendants' unlawful acts, representations, and omissions induced Plaintiff Rosica and the New Jersey Class members to purchase the Products. But for these unlawful acts and omissions, Plaintiff Rosica and the New Jersey Class would not have purchased the Products, or would have purchased the Products at a lower price.

131.    As a result of Defendants' conduct, Plaintiff Rosica and the New Jersey Class failed to receive the benefit of the bargain relative to the Products they purchased, and received less than what they were promised.

132.    As a result of Defendants' violations of the Consumer Fraud Act, Plaintiff Rosica and the New Jersey Class suffered an ascertainable loss and are entitled to damages.

## CLAIMS ON BEHALF OF ALL CLASSES

### SIXTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

133.    Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

134.   In every sale of goods, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Every sale of consumer goods that are sold at retail are accompanied by the manufacturer's and the merchant's implied warranty that the goods are merchantable. To be merchantable, goods must as least be such that: the goods pass without objection in the trade under the contract description; and are of fair average quality within the description; and are fit for the ordinary purposes for which such goods are used; and run, within the variations permitted by the agreement, of even kind and quality within each unit and among all units involved; and are adequately contained, packaged, and labeled as the agreement may require; and conform to the promises or affirmations of fact made on the container or label if any. Defendants are "merchants," and the Products Defendants sold are "goods".

135.   Defendants impliedly warranted to Plaintiffs and the Class that the Products were merchantable, including that the Products were fit for everyday use, including suitability for wear, stretching, repeated washing, daily use, exercise, and/or covering the skin based on the based on the advertising, marketing, communications, and sale of the Products as alleged herein.

136.   Defendants knew the Products were not merchantable in that they were not reasonably fit for the ordinary purposes for which they were manufactured and sold, including suitability for wear, stretching, repeated washing, daily use, exercise, and/or covering the skin. The quality of the Products was such that they developed holes, often immediately after initial use or washing. Such Products no longer were reasonably fit for ordinary purposes for which such goods are used, and not of fair average quality within the description. Products were also resold after unskilled repair by merchants, at the urging of Defendants, without notice that the products were sold "as is" or "with all faults". Other Products suffered from defects such as leggings having one leg manufactured longer than the other. The Products were not sold "as is" nor as "with all faults."

137.   Defendants had notice of these issues. In addition to thousands of complaints by consumers and Consultants, Defendants have publicly acknowledged quality issues, as alleged herein. Despite having notice, Defendants have failed to resolve these complaints, and refused to make refunds to Plaintiffs and the Class.

138.   Further, Plaintiffs and the Class are intended third-party beneficiaries of contracts between Defendants and Consultants, specifically, they are the intended beneficiaries of Defendants' implied warranties.

139.   This is clarified by the fact that Consultants were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements provided with the Products. The warranty agreements intended to benefit the ultimate consumers only. Specifically, Defendants' "Limited Warranty" states: "LuLaRoe warrants to the original purchaser that any original, unaltered, and unmodified product will be free of defects in materials and workmanship for a period of six months from the date of purchase, when sold in the United States by an authorized LuLaRoe Independent Fashion Retailer."

140.   As a result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the Classes who purchased such products suffered injury and are entitled to damages.

## SEVENTH CAUSE OF ACTION

### Quasi-Contract / Unjust Enrichment

141.   Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

142.   Defendants' conduct in enticing Plaintiffs and the Class to purchase their Products through false and misleading statements, advertising, and omission as described herein is unlawful because the statements are untrue.

143.   Plaintiffs and the Class would not have purchased the Products if the true facts had been known, or would not have paid the price they did.

144.   Plaintiffs and the Class conferred benefits on Defendants by purchasing the

Products. In addition, Defendants saved on the substantial cost of redesigning their Products to allow them to be used as intended, without becoming damaged, while maintaining the expected quality and comfort standards advertised by Defendants. Defendants have been unjustly enriched at the expense of Plaintiffs and the Class as result of their unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on Defendants to restore these ill-gotten gains to Plaintiffs and the Class.

145.   As a direct and proximate result of Defendants' breach of their quasi-contractual obligations, Plaintiffs and the Class have been damaged, and Defendants have been unjustly enriched thereby. Plaintiffs and the Class are entitled to damages as a result of Defendants' unjust enrichment, including restitution or restitutionary disgorgement in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief as follows:

1.   An Order certifying that this action may be maintained as a Class Action, appointing Plaintiffs to represent the proposed Class pursuant to Fed. R. Civ. P. 23(a) and designating their counsel as Class Counsel;

2.   An Order enjoining Defendants from future violations of the CLRA and UCL, as alleged herein;

3.   An Order awarding Plaintiffs and the Class restitution and/or disgorgement;

4.   An Order awarding Plaintiffs and the Class compensatory damages;

5.   An Order awarding Plaintiffs and the Class applicable civil penalties;

6.   An Order awarding Plaintiffs and the Class punitive damages;

7.   An Order awarding Plaintiff Rosica and the New Jersey Class treble damages under the New Jersey Consumer Fraud Act;

8.   An Order awarding Plaintiffs attorney's fees, expert witness fees and other costs, including pre-judgment and post-judgment interest thereon to the extent allowed by law; and

9.      Such other relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Class, hereby demand trial by jury as to all matters so triable.


Dated: May 18, 2017                    CASEY GERRY SCHENK
                                       FRANCAVILLA BLATT & PENFIELD, LLP


                                       By:   /s/ David S. Casey, Jr.
                                             DAVID S. CASEY, JR.
                                             *dcasey@cglaw.com*
                                             Attorneys for Plaintiffs and the Class

CLASS ACTION COMPLAINT